UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO VINSON,                                    Case No. 14-11130

     Plaintiff                                    Sean F. Cox
v.                                                 United States District Judge

CORIZON CORPORATION, *et al.*,                     Stephanie Dawkins Davis
                                                   United State Magistrate Judge
     Defendants.
_____/

## REPORT AND RECOMMENDATION:
## MOTION FOR SUMMARY JUDGMENT (Dkt. 198)

## I.     BACKGROUND AND PROCEDURAL HISTORY

Plaintiff Antonio Vinson, on behalf of decedent Michael Vincent, filed this civil rights complaint on March 17, 2014 against the Michigan Department of Corrections (MDOC) and several of its employees, Corizon Corporation and several of its employees, and Sharon Paratchak, arising from alleged inadequate medical care leading to Mr. Vincent's death.  (Dkt. 1).  On April 28, 2014, this matter was referred for all pretrial proceedings to Magistrate Judge Michael Hluchaniuk.  (Dkt. 7).  On January 5, 2016, this matter was reassigned to the undersigned magistrate judge and subsequently referred for all pretrial proceedings.  (*See* Text-Only Order dated 1/6/16 and Dkt. 92).  The case has a rather complicated procedural history, which is set forth below in order to provide context for its current posture.

The MDOC and its employees were dismissed pursuant to a stipulated order on May 2, 2017.  (Dkt. 152).  Defendant Paratchak was also dismissed from the lawsuit by a separate stipulation and order.  (Dkt. 193).  At that point, Corizon and its employees remained as the sole defendants in this case, with the exception of Dr. Bhamini Sudhir, who had been dismissed via the Court's Order on a Report and Recommendation dated January 21, 2016, and Adrienne Neff who was dismissed via stipulation and order on July 10, 2017.  (Dkt. 91, 170).  Plaintiff's Amended Complaint is the controlling complaint in this case.  (Dkt. 63).  In it plaintiff alleges in Count I that defendants Dr. Richard Miles, Dr. Karen Rhodes and Dr. Eddie Jenkins were deliberately indifferent to Mr. Vinson's serious medical needs.  (Dkt. 63, Pg ID 1063-67).  Plaintiff also alleges in Counts V and VI that Dr. Miles, Dr. Rhodes, and Dr. Jenkins, along with defendants Aryan Taymour, P.A., and Dawn Lybarger, N.P. conspired to ignore Mr. Vinson's complaints in violation of his constitutional rights.  (Dkt. 63, Pg ID 1081-88).  Plaintiff further alleges in Count VIII that Corizon Health, Inc. ("Corizon" and collectively the "Corizon Defendants") had an unconstitutional policy of delaying medical care.  (Dkt. 61, Pg ID 1091-95).  The Corizon defendants filed a motion to dismiss plaintiff's amended complaint.  (Dkt. 66).  Magistrate Judge Hluchaniuk recommended dismissal of several of plaintiff's claims but also identified certain claims that could move forward to discovery.  (Dkt. 86, Pg ID 1500).  The Corizon

defendants' objections were sustained in part and overruled in part by the District Court.  (Dkt. 91, Pg ID 1556-57).  Therefore, upon entry of the District Court's Order, the following claims remained:  Count I (deliberate indifference to a serious medical need) against Dr. Miles, Dr. Rhodes, and Dr. Jenkins; Count V (civil conspiracy) against Dr. Miles, Dr. Rhodes, Dr. Jenkins; Count VI (civil conspiracy) against Taymour and Lybarger; and Count VIII (*Monell* claim) against Corizon.  (Dkt. 91, Pg ID 1556-57).

After a period of discovery and extensive motion practice, the remaining defendants, Corizon Corporation, Dr. Eddie Jenkins, Dawn L. Lyberger, Dr. Richard Miles, Dr. Karen Rhodes, and Arayan Taymour filed a second motion for summary judgment.  (Dkt. 198, 200).  Plaintiff filed the response on November 6, 2017.  (Dkt. 207).  Defendants filed their reply on November 20, 2017.  (Dkt. 208). On May 23, 2018, the parties filed their joint statement of resolved and unresolved issues.  (Dkt. 229).  As set forth in the response and the joint statement, plaintiff has agreed to dismiss all claims against defendants Taymour and Lybarger.  (Dkts. 207, 229).  Thus, the dispute before the Court involves only the deliberate indifference and conspiracy claims asserted against defendants Miles, Rhodes, and Jenkins along with the *Monell* claim against Corizon.  Notably, the court previously ordered that no consideration would be given to any evidence offered by Dr. Nathan Evans, plaintiff's medical expert witness, as a sanction under Rule

37 for plaintiff's failure to comply with the expert disclosure requirements of the federal rules of civil procedure and this Court's previous orders regarding the same. (Dkt. 226). Neither party objected to this Order. Accordingly, in this report and recommendation the undersigned has not given any consideration to Dr. Evan's opinions offered by plaintiff in the response to the motion for summary judgment.

For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **GRANTED** as to the defendants Miles, Jenkins, Rhodes, and Corizon. The undersigned further **RECOMMENDS** that defendants Taymour and Lyberger be **DISMISSED** pursuant to plaintiff's agreement, as set forth in the response and joint statement. (Dkts. 207, 229).

## II.    FACTUAL BACKGROUND

There is no dispute that Mr. Vinson died from a ruptured abdominal aortic aneurysm ("AAA") on May 25, 2012 while in the custody of the MDOC. (Dkt. 198, Ex. A, pp. 1-5). Mr. Vinson was a 42 year-old African American former smoker who had normal blood pressure, no history of aneurysms, and no known family history of aneurysms. (Dkt. 198, Ex. A). According to the Corizon defendants, the typical patient with AAA is a male, Caucasian smoker of advanced age, with a family history of aortic aneurysm, hypertension, and atherosclerosis. (Dkt. 183-8, Pg ID 3359, Dr. Michael Duffy expert report). The Corizon

defendants also assert that most AAAs do not cause any symptoms until the aneurysm begins to dissect or there is impending rupture. Rupture or dissection of an aortic aneurysm is generally an acute event and the symptoms can cause acute abdominal, back pain and leg pain with hypotension and cardiovascular collapse. (Dkt. 183-8, Duffy expert report, Pg ID 3358-59). As explained by Dr. Ljubisa Dragovic, another of Corizon's experts, Mr. Vinson's particular type of AAA and its location made it inaccessible to physical examination, which accounts for the negative findings on multiple documented palpation exams. (Dkt. 183-7, Pg ID 3309). Additionally, the particular type of AAA Mr. Vinson had would not have generated any audible noise (bruits), which also explains why multiple attempts to listen to Mr. Vinson's belly with a stethoscope failed to elicit any bruits. *Id.* at 3309-3310.[1]

---

[1] The Corizon defendants cited and attached an article to their motion for summary judgment for the Court's consideration concerning AAA presentation. (Dkt. 198, Ex. F). Typically, the court may not consider such an article because it is inadmissible hearsay. As explained in *Colwell v. Corizon Healthcare Inc.*, 2014 WL 6686764, at *21 (E.D. Mich. Nov. 26, 2014), aff'd (Oct. 7, 2015), the court cannot consider such an article on a motion for summary judgment because it constitutes hearsay under the Federal Rules of Evidence and is not covered by any of the exceptions to those rules. *Id.* (citing *Flones v. Beaumont Health System*, 567 Fed. Appx. 399, 405 (6th Cir. June 4, 2014) ("it is well established that a court may not consider inadmissible hearsay when deciding a summary-judgment motion.")). Although Federal Rule of Evidence 803(18) does provide a hearsay exception for "learned treatises," such documents are only admissible "[t]o the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination." *Id.* The Corizon defendants have not presented these medical articles in conjunction with expert testimony. On the other hand, plaintiff did not object to this evidence under Fed. R. Civ. P. 56(c)(2), which provides that the nonmoving party may object to the moving party's summary judgment evidence if it "cannot" be presented in a form that would ultimately be admissible. *See Lossia v.*

Accordingly, the Corizon defendants maintain that Mr. Vinson's medical providers examined his abdomen on many occasions, but there was never a detectable pulsating mass or bruits.  (Dkt. 198, Exs. A-E).  They also point out that Mr. Vinson had an established history of musculoskeletal back pain, which they say provided a likely explanation for his complaints.  (Dkt. 198, Exs. A-E; Dkt. 183-8, Pg ID 3358-3360).  According to the Corizon defendants, Mr. Vinson had an unusual, saccular aneurysm located in the back of his lower belly, obscured by his bowels and this is the reason why the AAA was not detectable on palpation or auscultation.  (Dkt. 183-7, Pg ID 3309-3310).  Defendants' experts say that the defendants could not have been expected to detect Mr. Vinson's AAA because of the unusual nature of the AAA combined with the facts that he was unusually young for AAA and did not fit the profile of a typical AAA patient.  (Dkt. 183-5; Dkt. No. 183-6; Dkt. 183-7; Dkt. No. 183-8).  It is against this backdrop that the Corizon defendants ask the Court to analyze the chronology of Mr. Vinson's medical care and whether they violated his constitutional rights.

While the defendants provide an extensive summary of Mr. Vinson's medical treatment, this report contains a more abbreviated summary that is focused

---

*Flagstar Bancorp, Inc.*, 895 F.3d 423, 430 (6th Cir. 2018).  Nevertheless, the court is permitted to rely on evidence found in the record and thus refers to available expert opinion evidence concerning the features of AAA and its presentation.

on the care the remaining defendants provided relating to Mr. Vinson's abdominal pain complaints.  On October 26, 2011, Dr. Miles assessed Mr. Vinson's complaints of back pain.  (Dkt. 200-1, Ex. A, pp. 174-75).  Dr. Miles indicated that Mr. Vinson was not doing exercises that would aggravate his back, noted that Naprosyn (naproxen) was not providing him with relief, and planned to reassess him with defendant Karen Rhodes, D.O.  (Dkt. 200-1, Ex. A, p. 174). Two days later, on October 28, 2011, Dr. Miles and Dr. Rhodes assessed Mr. Vinson's back pain complaints as well as his constipation.  (Dkt. 200-1, Ex. A, pp. 169-72); (Dkt. 198-3, Ex. C, pp. 84-94). They decided to change Mr. Vinson's pain medication from naproxen to Mobic, and ordered a follow-up appointment for Mr. Vinson in two months.  (Dkt. 200-1, Ex. A, p. 169).  Dr. Miles consulted with Dr. Rhodes because of her background in osteopathic medicine.  (Dkt. 198-3, Ex. C., pp. 86-87).  Dr. Rhodes stated that "based on [her] examination, . . . [she knew they] weren't dealing with a herniated disk, and [Mr. Vinson] didn't give me the symptoms that were consistent with [nerve impingement]."  (Dkt. 198-3, Ex. C, pp. 92-93). "[T]here was no motor or sensory deficits."  (Dkt. 198-3, Ex. C, p. 92).

Two days after his appointment with Dr. Rhodes and Dr. Miles, MDOC Nurse Linda Haase, R.N. assessed Mr. Vinson's gastrointestinal pain on October 30, 2011 after he said that he had vomited at 7:00 a.m. that morning.  (Dkt. 200-1, Ex. A, p. 168).  She examined Mr. Vinson's abdomen, noted that she could hear

his bowel sounds and that she could feel stool in his colon, but also indicated that

Mr. Vinson had "localized tenderness" in the left lower quadrant of his abdomen.

(Dkt. 200-1, Ex. A, p. 168).  Nurse Haase provided Mr. Vinson with milk of

magnesia "to help break up gas he is feeling."  (Dkt. 200-1, Ex. A, p. 168).

Roughly a week later, on November 7, 2011, Mr. Vinson again complained of back

pain, but made no mention of any abdominal pain or gastrointestinal issues.  (Dkt.

200-1, Ex. A, p. 167).  MDOC Nurse and former defendant Cindi Murphy, R.N.

responded to Mr. Vinson's kite by scheduling him to see a nurse in accordance

with MDOC policy. (Dkt. 200-1, Ex. A, p. 167)  On November 8, 2011, Nurse

Carlson evaluated Mr. Vinson's back pain complaint, noted that Dr. Rhodes and

Dr. Miles had recently changed Mr. Vinson's pain medication from naproxen to

Mobic to address Mr. Vinson's back pain, and ordered another MSP Sick Call

appointment for Mr. Vinson.  (Dkt. 200-1, Ex. A, p. 165-66).

On December 5, 2011, MDOC Nurse Joy Ryan, R.N. assessed Mr. Vinson's

complaint of lower abdominal discomfort.  (Dkt. 200-1, Ex. A, p. 152).  She

ordered an immediate follow-up appointment for Mr. Vinson and noted that Mr.

Vinson's bowel sounds were normal in all four abdominal quadrants.  (Dkt. 200-1,

Ex. A, p. 152).  Minutes later, defendant Eddie Jenkins, M.D. ("Dr. Jenkins")

assessed Mr. Vinson's complaints of sharp lower left abdominal pain and noted

that he could hear "[n]o mu[r]murs, gallops, or rubs" while examining Mr. Vinson

with a stethoscope.  (Dkt. 200-1, Ex. A, pp. 145-46).  Dr. Jenkins also noted that

Mr. Vinson's pain had been worsening over the past month, and that Mr. Vinson

denied any trauma (i.e., an injury or wound), though he acknowledged that he had

been lifting more than 200 pounds in the weight pit.  (Dkt. 200-1, Ex. A, p. 145).

Mr. Vinson also informed Dr. Jenkins that none of his pain medications were

effective.  (Dkt. 200-1, Ex. A, p. 145).  Dr. Jenkins ordered an x-ray for Mr.

Vinson, which occurred that same day.  (Dkt. 200-1, Ex. A, pp. 150, 156).

On December 7, 2011, Mr. Vinson met with NP Lybarger for his previously

scheduled provider visit.  NP Lybarger reassessed Mr. Vinson's abdominal pain

complaints and symptoms of bloating, constipation, back pain, fatigue, and nausea.

(Dkt. 200-1, Ex. A, pp. 153-55) (Dkt. 198-5, Ex. E, pp. 22-23).  NP Lybarger

examined Mr. Vinson, noted that there was no abdominal mass, that his bowel

sounds were present with no bruits, and ordered (1) Phenergan for nausea; (2) labs

to be drawn the same day (to check for signs of internal bleeding or infection); and

(3) a follow-up appointment to occur on December 9, 2011 to reassess Mr. Vinson

with Dr. Miles.  (Dkt. 200-1, Ex. A, pp. 151, 154); (Dkt. 198-5, Ex. E, pp. 25-26,

27-28, 29).

Radiologist Michael Henderson, D.O. read the December 5, 2011 x-ray film

on December 8, 2011 and noted Mr. Vinson's abdomen appeared normal with "no

definite process of the abdomen present."  (Dkt. 200-1, Ex. A, p. 156).  Dr.

Henderson also noted that Mr. Vinson had "[m]ild degenerative disc changes at the L5-S1 level" with "[m]ild facet joint arthritic changes . . . throughout the lumbar spine." (Dkt. 200-1, Ex. A, p. 156). Four days later, on December 9, 2011, Mr. Vinson met with Dr. Miles for a previously scheduled appointment. Dr. Miles assessed Mr. Vinson for abdominal pain that Mr. Vinson said was occasionally relieved or decreased by moving his bowels. (Dkt. 200-1, Ex. A, pp. 147-48). Dr. Miles noted that Mr. Vinson's lab results were normal except for mild anemia and ordered a stool specimen to determine if Mr. Vinson had internal bleeding. (Dkt. 200-1, Ex. A, p. 147). Dr. Miles examined Mr. Vinson, noted that Mr. Vinson's bowel sounds were present with no bruits, and that he could not detect any palpable masses. (Dkt. 200-1, Ex. A, pp. 147-48). Dr. Miles ordered a follow-up visit to occur on or about December 19, 2011 and provided patient education. (Dkt. 200-1, Ex. A, p. 148).

On December 13, 2011, MDOC Nurse Joy Ryan responded to Mr. Vinson's complaints of abdominal pain that prevented him from being able to go to JCF's health care clinic. (Dkt. 200-1, Ex. A, pp. 134-37). Nurse Ryan provided Mr. Vinson with Phenergan and arranged for Mr. Vinson to be taken to the clinic via "miniamb[ulance]." (Dkt. 200-1, Ex. A, p. 135). Minutes later, Dr. Miles reassessed Mr. Vinson. (Dkt. 200-1, Ex. A, pp. 140-42). Mr. Vinson stated that he had just come from the weight pit and had complaints of abdominal pain. (Dkt.

200-1, Ex. A, p. 140).  Dr. Miles examined Mr. Vinson with a stethoscope and noted that bowel sounds were present, that he heard no bruits, murmurs, or extraneous cardiovascular sounds.  (Dkt. 200-1, Ex. A, pp. 140-41).  Dr. Miles determined that Mr. Vinson should continue taking his current medications. (Dkt. 200-1, Ex. A, p. 140).  Dr. Miles ordered a follow-up visit to occur on or about December 19, 2011 and provided patient education.  (Dkt. 200-1, Ex. A, p. 142).

On December 15, 2011, Mr. Vinson complained of abdominal pain to MDOC Nurse and former defendant Frances Hinsley, R.N.  (Dkt. 200-1, Ex. A, pp. 132-33).  Nurse Hinsley referred Mr. Vinson to Dr. Rhodes.  (Dkt. 200-1, Ex. A, pp. 133).  Minutes later, Dr. Rhodes assessed Mr. Vinson's complaints of left-sided abdominal pain, constipation, and nausea.  (Dkt. 200-1, Ex. A, pp. 129-30); (Dkt. 198-3, Ex. C, pp. 32-61).  Mr. Vinson told Dr. Rhodes that he had not had diarrhea or vomiting.  (Dkt. 200-1, Ex. A, p. 129); (Dkt. 198-3, Ex. C, p. 35).  Dr. Rhodes examined Mr. Vinson's abdomen and noted that bowel sounds were present and that there were no bruits.  (Dkt. 200-1, Ex. A, p. 129); (Dkt. 198-3, Ex. C, pp. 55-56).  To address Mr. Vinson's pain, Dr. Rhodes ordered a Toradol injection. (Dkt. 200-1, Ex. A, p. 130); (Dkt. 198-3, Ex. C, pp. 52-53).  Dr. Rhodes also ordered Mr. Vinson to have a clear liquid diet until his nausea subsided, and ordered milk of magnesia for him.  (Dkt. 200-1, Ex. A, p. 130); (Dkt. 198-3, Ex. C, pp. 58-

60).  Nurse Hinsley administered the Toradol injection, gave Mr. Vinson two

bottles of milk of magnesia (that Mr. Vinson drank), and noted that Mr. Vinson

refused to accept the clear liquid diet that Dr. Rhodes wanted to order for him.

(Dkt. 200-1, Ex. A, p. 131); (Dkt. 198-3, Ex. C, p. 51).  MDOC Nurse and former

defendant Karen Hamblin, R.N. also gave Mr. Vinson a bottle of magnesium

citrate later that evening.  (Dkt. 200-1, Ex. A, p. 128).

On December 20, 2011 Nurse Hamblin assessed Mr. Vinson's complaints of

low back pain, noted that he did not have any "problems getting up and down" and

"move[d] with ease."  (Dkt. 200-1, Ex. A, pp. 125-27).  Nurse Hamblin ordered a

follow-up provider visit and provided Mr. Vinson with Flexeril.  (Dkt. 200-1, Ex.

A, p. 127).  The next day, PA Taymour examined Mr. Vinson for his complaints of

lower back pain and abdominal pain.  (Dkt. 200-1, Ex. A, pp. 120-21, 124); (Dkt.

198-4, Ex. D, pp. 34-41).  PA Taymour examined Mr. Vinson's abdomen and

noted that his bowel sounds were present, there were no bruits, no hepatic

enlargement, and no spleen enlargement.  (Dkt. 200-1, Ex. A, p. 120).  PA

Taymour ordered a urine analysis to rule out the possibility of a urinary tract

infection (UTI) causing Mr. Vinson's pain, and provided Mr. Vinson with

Ultram—because he had tenderness upon anterior palpation and because the

Flexeril from the previous day had not helped.  (Dkt. 200-1, Ex. A, p. 120-21);

(Dkt. 198-4, Ex. D, p. 38).  She did not order another Toradol injection for Mr. Vinson because "it was out of stock[.]"  (Dkt. 198-4, Ex. D, p. 41).

On December 22, 2011 Nurse Hinsley again assessed Mr. Vinson and referred him to Dr. Jenkins, who reassessed Mr. Vinson for complaints of lower back pain.  (Dkt. 200-1, Ex. A, pp. 116-17, 122-23).  Dr. Jenkins examined Mr. Vinson and noted that his complaints were consistent with mild arthritic changes.  (Dkt. 200-1, Ex. A, p. 122).  Dr. Jenkins ordered another Toradol injection for Mr. Vinson, specifically asking for the MDOC nurses to "get [the medication] from [the] emer[gency] box" since the medication was out of stock.  (Dkt. 200-1, Ex. A, p. 122).  Dr. Jenkins also instructed Mr. Vinson to do back stretching exercises and follow up with Dr. Miles as needed.  (Dkt. 200-1, Ex. A, pp. 122-23).  Nurse Hinsley administered the Toradol injection.  (Dkt. 200-1, Ex. A, p. 113).

On December 29, 2011 MDOC staff called Nurse Carlson to Mr. Vinson's housing unit because of his continued complaints of lower back pain and abdominal pain.  (Dkt. 200-1, Ex. A, pp. 111-12).  Nurse Carlson noted that Mr. Vinson "[a]mbulated to [the] mini amb[ulance] without difficulty" and referred him to Dr. Jenkins for reassessment of Mr. Vinson's complaints of sharp back pain as well as intermittent left lower quadrant abdominal pain.  (Dkt. 200-1, Ex. A, pp. 109-12). Mr. Vinson told Dr. Jenkins he had been vomiting each of the previous ten days.  (Dkt. 200-1, Ex. A, p. 109).  Dr. Jenkins examined Mr. Vinson's

abdomen and found no abnormalities.  (Dkt. 200-1, Ex. A, p. 110). Nonetheless,

Dr. Jenkins sent Mr. Vinson to the Duane Waters Hospital (DWH) emergency

room for further evaluation, because the etiology of Mr. Vinson's pain was

unclear.  (Dkt. 200-1, Ex. A, pp. 109-10, 114-15).  While at DWH, David Launder,

P.A. assessed Mr. Vinson's complaints of left lower quadrant abdominal pain and

vomiting.  (Dkt. 200-1, Ex. A, p. 114-15).  On December 30, 2011, PA Launder

noted Mr. Vinson reported that he had vomited for 45 days in a row and stated that

Mr. Vinson's abdomen was soft and flat with no rebound tenderness, but there was

some tenderness overall on examination.  (Dkt. 200-1, Ex. A, p. 114).  PA Launder

concluded that Mr. Vinson's symptoms reflected "chronic abdominal pain with

history of constipation" and "chronic back pain."  (Dkt. 200-1, Ex. A, p. 114).

Shortly thereafter, DWH personnel determined no further testing was necessary,

and Mr. Vinson returned to JCF.

On January 3, 2012, Dr. Miles assessed Mr. Vinson's complaints of back

and abdominal pain and found no abnormalities.  (Dkt. 200-1, Ex. A, pp. 101-02).

The next day, after an initial assessment by Nurse Hinsley that revealed no

abdominal abnormalities, Dr. Jenkins assessed Mr. Vinson's complaints of back

and abdominal pain and also found no abnormalities.  (Dkt. 200-1, Ex. A, pp. 97-

100).  MDOC Nurse and former defendant Patricia Faling, R.N. then assessed Mr.

Vinson on January 6, 2012, and noted that Mr. Vinson had "good active bowel

sounds [in all] 4 [abdominal] quad[rant]s[.]  [Patient] very angry that he did not see

MSP today[.] [A]ll vitals W[ithin] N[ormal] L[imits] no tenderness on palpation[.]

[Patient] has app[ointment]t on [M]onday with MSP."  (Dkt. 200-1, Ex. A, p. 91).

On January 9, 2012, PA Taymour assessed Mr. Vinson's complaints of

lower back pain, examined him, and recommended Mr. Vinson take anti-nausea

medication.  (Dkt. 200-1, Ex. A, pp. 87-88).  Mr. Vinson "didn't complain of

abdominal pain on that day[.]"  (Dkt. 98-4, Ex. D, p. 52).  She heard "[n]o

murmurs, gallops, or rubs" with a stethoscope and noted that Mr. Vinson's

abdomen was "[s]oft, non-tender without organomegaly or masses."  (Dkt. 200-1,

Ex. A, p. 87).  After the appointment, PA Taymour discussed her assessment of

Mr. Vinson "with Dr. Miles and then Dr. Jenkins and then . . . a meeting . . . with

the nurse practitioner [Lybarger] and another PA [Neff]."  (Dkt. 98-4, Ex. D, p.

50).  "[W]e discussed about his pain, that he comes here often and then I was told .

. . not [to] give him Ultram because it's narcotic and it can cause addiction and it's

only given for acute cases, not something to be given chronically like every time."

(Dkt. 98-4, Ex. D, p. 51).  Dr. Jenkins and Dr. Miles agreed with PA Taymour's

treatment plan, which included having Mr. Vinson take "anti-nausea vomiting

medication, but he refused, and . . . [for Mr. Vinson to] increase [the] amount of

fluid, water, seven, eight glasses daily, [and that he] should continue Tylenol for

pain and Motrin on full stomach."  (Dkt. 98-4, Ex. D, p. 51).

On January 17, 2012, Mr. Vinson sent a kite requesting medical care due to continued back pain and abdominal pain.  (Dkt. 200-1, Ex. A, p. 84).  Nurse Murphy responded to Mr. Vinson's kite request and scheduled a nurse sick call appointment to take place on or about January 19, 2012.  (Dkt. 200-1, Ex. A, p. 84).  On January 20, Nurse Upston rescheduled the appointment to occur on or about January 23, 2012.  (Dkt. 200-1, Ex. A, p. 83).  On January 24, 2012, Nurse Hense assessed Mr. Vinson during the scheduled nurse sick call appointment and noted that she found "No abnormal abdominal findings, no guarding, no tenderness, no facial grimace with palpitation."  (Dkt. 200-1, Ex. A, p. 79-81). "Inmate appears in no distress, requesting to see a specialist and to have a MRI, no [complaints of] heartburn, reflux, no diarrhea or gas."  (Dkt. 200-1, Ex. A, p. 81). Nonetheless, Nurse Hense referred Mr. Vinson to the Corizon providers for further assessment.  (Dkt. 200-1, Ex. A, p. 81).

On January 26, 2012, MDOC Nurse and former defendant Cindy Speer went to Mr. Vinson's housing unit in response to a call from correctional officers informing her that Mr. Vinson "was vomiting and was too weak to walk to health care."  (Dkt. 200-1, Ex. A, p. 76).  Nurse Speer took Mr. Vinson by wheelchair to the JCF health care clinic, measured Mr. Vinson's vital signs, performed an EKG, and immediately referred Mr. Vinson to Dr. Rhodes for further evaluation.  (Dkt. 200-1, Ex. A, p. 76).  Dr. Rhodes reassessed Mr. Vinson's complaints of chest pain

and left lower quadrant abdominal pain.  (Dkt. 200-1, Ex. A, pp. 74-75); (Dkt. 98-3, Ex. C, pp. 62-80, 95-102).  She noted that on examination, Mr. Vinson had no bruits and that his EKG revealed "no ischemic changes."  (Dkt. 200-1, Ex. A, p. 75).  Based on her examination of Mr. Vinson, Dr. Rhodes ordered another Toradol injection for Mr. Vinson.  (Dkt. 200-1, Ex. A, p. 74).

Three days later, Nurse Speer evaluated Mr. Vinson in his housing unit.  (Dkt. 200-1, Ex. A, p. 68).  She noted that his vital signs were normal and that she "[t]alked to inmate about how we keep taking him to health care and he has to walk back to his unit.  Told him we are not going to send him out and he needed to stay in his unit.  If anything changes he is to call health care again."  (Dkt. 200-1, Ex. A, p. 68).  Then on January 31, 2012, MDOC Nurse Michelle Couling, R.N. evaluated Mr. Vinson in his cell for complaints of abdominal pain.  (Dkt. 200-1, Ex. A, pp. 66-67).  Nurse Couling noted that Mr. Vinson was "being verbally abusing to staff" and referred Mr. Vinson to Dr. Miles for further evaluation. (Dkt. 200-1, Ex. A, p. 67).  Dr. Miles assessed Mr. Vinson that same day for his complaints of abdominal pain that Mr. Vinson reported was radiating to his back.  (Dkt. 200-1, Ex. A, p. 71-73).  Dr. Miles examined Mr. Vinson and found no signs of "abdominal mass, bloating, blood in stool, change in appetite, change in bowel habits, constipation, decreased appetite, diarrhea, dysphagia, fecal incontinence, flatulence, heartburn, hematemesis, hemorrhoids, increased appetite, jaundice,

melena, nausea, odynophagia, rectal bleeding [or] reflux." (Dkt. 200-1, Ex. A, p. 72). Dr. Miles also noted that Mr. Vinson's "[b]owel sounds [were] present, no bruits." (Dkt. 200-1, Ex. A, p. 72). Furthermore, Dr. Miles stated "Patient not tender when palpitate[ed] with stet[h]oscope. No tenderness with percussion of left foot or S[traight] L[eg] R[aise]." (Dkt. 200-1, Ex. A, p. 72). However, when examining the back and spine Mr. Vinson displayed "[s]ignificant tenderness to palpation with paper clip." (Dkt. 200-1, Ex. A, p. 72). Dr. Miles indicated that "Patient refused treatment recommendations." (Dkt. 200-1, Ex. A, p. 73). Dr. Miles stated during his deposition that he "did not feel that [a gastroenterologist referral] was warranted at that time based on the physical findings and the history that I was receiving in evaluation of Mr. Vinson." (Dkt. 98-2, Ex. B, p. 198). Dr. Miles said, "If I felt it was warranted for him to see a gastroenterologist, I would send him. I would not withhold him seeing a gastroenterologist if it was necessary." (Dkt., 98-2, Ex. B, p. 198). According to Dr. Miles, a referral was not necessary because "the subjective complaints [did not] match[] the objective findings[.]" (Dkt. 198-2, Ex. B, p. 199). Dr. Miles' assessment and plan comments on January 31, 2012 were,I "Subjective complaints without consist[e]nt objective finding. Patient is to KITE [as needed]." (Dkt. 200-1, Ex. A, p. 73).

Nurse Faling then assessed Mr. Vinson on February 8, 2012 for complaints of "back and stomach pain[,] chronic problem" and noted that his "vital[] [signs

were] stable[.] Dr. Miles is to examine inmate [and Mr. Vinson] left healthcare

without incident." (Dkt. 200-1, Ex. A, pp. 63-64). Dr. Miles noted that Mr.

Vinson refused to give a urine sample to determine if an infection was causing Mr.

Vinson's pain and that the appointment ended shortly thereafter due to Mr. Vinson

being uncooperative. (Dkt. 200-1, Ex. A, p. 62). Then on February 12, 2012,

Nurse Hense attempted to assess Mr. Vinson's complaints of pain but Mr. Vinson

was "uncooperative, refusing to get on exam table and be evaluated." (Dkt. 200-1,

Ex. A, pp. 59-61). Nurse Hense contacted PA Neff by telephone to make her

aware of the situation. (Dkt. 200-1, Ex. A, p. 61).

A few days after Nurse Hense's attempt to address Mr. Vinson's complaints,

Mr. Vinson met with psychiatrist Michaela Weller, M.D. on February 15, 2012.

(Dkt. 200-1, Ex. A, p. 56-57). She noted that Mr. Vinson had written a grievance

against the medical staff and "appear[ed] frustrated with what he perceives to be a

lack of care from medical staff." (Dkt. 200-1, Ex. A, p. 56). Dr. Weller indicated

that Mr. Vinson's claimed weight loss of 25 pounds was not substantiated by the

medical record: "his weight was 185 on 10/30/11 and was stable around that

weight for some time and is now 169 when taken on 2/8/12." (Dkt. 200-1, Ex. A,

p. 56).

Mr. Vinson did not make any further requests for health care until March 15,

2012.  On that day, Nurse Hense responded to Mr. Vinson's complaints of back pain and abdominal pain in the chow hall.  (Dkt. 200-1, Ex. A, p. 48).  Mr. Vinson "declined to be seen, stating that they won't do anything for me in healthcare." (Dkt. 200-1, Ex. A, p. 48).  A few days later, on March 21, 2012, Nurse Hamblin responded to Mr. Vinson's kite in which he complained of back and stomach pain. (Dkt. 200-1, Ex. A, p. 47).  Nurse Hamblin scheduled a nurse sick call appointment for Mr. Vinson.  (Dkt. 200-1, Ex. A, p. 47).

On March 23, 2012, MDOC medical assistant John Tinervia assessed Mr. Vinson's vital signs before Mr. Vinson met with NP Lybarger for a chronic care appointment.  (Dkt. 200-1, Ex. A, pp. 46, 51).  During the chronic care appointment, NP Lybarger assessed Mr. Vinson's complaints of back and abdominal pain and Dr. Miles joined them to discuss the "plan of care with [the patient] as well."  (Dkt. 200-1, Ex. A, pp. 51-54); (Dkt. 98-5, Ex. E, pp. 34-41). NP Lybarger noted that Mr. Vinson's heart sounded normal with a stethoscope: he had no murmurs or extra cardiovascular sounds.  (Dkt. 200-1, Ex. A, p. 53).  NP Lybarger also noted that Mr. Vinson's bowel sounds were present and that he had no bruits.  (Dkt. 200-1, Ex. A, p. 53); (Dkt. 98-5, Ex. E, p. 39).  Furthermore, NP Lybarger noted that Mr. Vinson's abdomen was soft without any palpable masses or acute objective findings on examination.  (Dkt. 200-1, Ex. A, p. 53); (Dkt. 98-5, Ex. E, p. 39).  NP Lybarger's treatment plan included scheduling a chronic care

appointment to take place in approximately three months and gave Mr. Vinson

instructions to return to the health care clinic as needed.  (Dkt. 200-1, Ex. A, p. 54).

NP Lybarger ordered a dietary referral due to her concerns regarding Mr. Vinson's

weight loss of 15 pounds in four months.  (Dkt. 200-1, Ex. A, p. 54); (Dkt. 98-5,

Ex. E, pp. 38, 41).  Additionally, NP Lybarger ordered MDOC nurses to collect a

blood sample from Mr. Vinson for laboratory analysis to see if there was evidence

of an infection, internal bleeding, or any other abnormality.  (Dkt. 200-1, Ex. A, p.

44).  Furthermore, NP Lybarger gave an order for Mr. Vinson to have a bottom

bunk in his housing unit to avoid exacerbating his pain.  (Dkt. 200-1, Ex. A, p. 43);

(Dkt. 98-5, Ex. E, p. 34).

On April 9, 2012, Mr. Vinson met with MDOC Dietician Kelly Wellman.

(Dkt. 200-1, Ex. A, p. 42).  Ms. Wellman indicated that "inmate has not had

clinically significant weight loss, and his BMI indicates he is on the border

between healthy/overweight range."  (Dkt. 200-1, Ex. A, p. 42).  She also noted

that Mr. Vinson's "[a]bdominal pain could be [related to] intake of hot/spicy foods

from the store."  (Dkt. 200-1, Ex. A, p. 42).  Ms. Wellman reviewed Mr. Vinson's

store purchases and noted that Mr. Vinson had bought "Chili ramen noodles,

chicken ramen noodles, jolly ranchers candy, atomic fireballs, chik-o sticks, butter

popcorn, hot and spicy corn chips, nacho chips, sour cream and onion chips, peanut

butter cookies, chocolate chips cookies, jalapeno cheese spread, jalapeno peppers,

pickles, hot sauce, rice, hot beef summer sausage, hot chili with beans."  (Dkt. 200-1, Ex. A, p. 42).  She then added Mr. Vinson "to list for dieti[c]ian callout to discuss diet, abdominal pain, [and] weight loss."  (Dkt. 200-1, Ex. A, p. 42).  Then on April 13, 2012, Ms. Wellman conducted a nutritional assessment of Mr. Vinson, and noted that Mr. Vinson "want[ed] to have an appointment with a gasterologist [sic], which he repeat[ed] several times."  (Dkt. 200-1, Ex. A, pp. 40-41).  However, Ms. Wellman indicated that a referral was not necessary because Mr. Vinson's weight loss was "likely related to inmates [sic] claim that he wasn't eating, and should resolve with regular intake at meals."  (Dkt. 200-1, Ex. A, p. 40).  She "[r]ecommend[ed] avoiding the hot and spicy store foods, keep[ing] a food journal to identify potential food triggers.  Continue to eat meals to promote maintenance of current weight, and prevent further weigh loss.  Inmate can kite if he has additional questions or concerns."  (Dkt. 200-1, Ex. A, p. 40).

Four days later, on April 17, 2012, Nurse Speer responded to Mr. Vinson's continued complaints of abdominal pain and back pain and had him brought to the clinic by wheelchair.  (Dkt. 200-1, Ex. A, p. 39).  Once in the clinic, Nurse Speer measured Mr. Vinson's vital signs, placed a hot pack on Mr. Vinson's back to soothe his pain, and spoke to a physician's assistant about Mr. Vinson's complaints.  (Dkt. 200-1, Ex. A, p. 39).  In response to Mr. Vinson's complaints, he was "given Toradol 60 mg IM in right buttock cheek."  (Dkt. 200-1, Ex. A, p.

39). Mr. Vinson became argumentative and Nurse Speer requested officer assistance to have him removed from the clinic. (Dkt. 200-1, Ex. A, p. 39). The next day, on April 18, 2012, MDOC Nurse Karina Beals, L.P.N. responded to a call from Mr. Vinson's housing unit and noted that Mr. Vinson received permission from Dr. Miles to come to health care for an assessment if Mr. Vinson "filled out a kite and brought it to HC [Healthcare Clinic] with him." (Dkt. 200-1, Ex. A, p. 45). Mr. Vinson refused. (Dkt. 200-1, Ex. A, p. 45). Nurse Beals did not order a nurse sick call appointment and noted "[n]o follow-up indicated." (Dkt. 200-1, Ex. A, p. 45).

On April 25, 2012, Mr. Vinson met with Dr. Miles for his chronic care appointment. (Dkt. 200-1, Ex. A, pp. 33-35). Dr. Miles examined Mr. Vinson and noted that there was "no distention, no abdominal appliances, normal abdominal muscles. Bowel sounds [were] present, no bruits. [Mr. Vinson's abdomen was] [s]oft, nontender, with no organomegaly. There is no abdominal tenderness, guarding or rebound." (Dkt. 200-1, Ex. A, p. 34). Dr. Miles ordered a follow-up appointment to occur in one month, advised Mr. Vinson to continue his current medication, and provided Mr. Vinson with patient education. (Dkt. 200-1, Ex. A, p. 35). Dr. Miles also ordered a "Liver (Hepatic) Function Panel" blood test as well as requesting MDOC nurses to collect a stool sample from Mr. Vinson to check for internal bleeding. (Dkt. 200-1, Ex. A, p. 35).

On May 5, 2012, Nurse Hinsley addressed Mr. Vinson's complaints regarding abdominal pain, then on May 11, 2012 scheduled Mr. Vinson for a MSP sick all appointment to occur on or about May 21, 2012. (Dkt. 200-1, Ex. A, pp. 21-22). Nurse Speer also assessed Mr. Vinson, measured his vital signs (which were normal), and noted that Mr. Vinson's bowel sounds were present and his lungs were clear upon examination with a stethoscope. (Dkt. 200-1, Ex. A, p. 20). Mr. Vinson sent a kite on May 14, 2012 which Nurse Murphy responded to on the 15th, saying he had a MSP appointment already scheduled for the following week and to address his concerns with the provider at that time. (Dkt. 200-1, Ex. A, p. 19).

On May 16, 2012, Mr. Vinson moved into protective custody due to another inmate threatening him on the yard. (Dkt. 98-7, Ex. G, p. 21). He sought a transfer to another facility to avoid the threat made on his life. *Id*. Nurse Speer assessed Mr. Vinson to clear him for segregation while in protective custody. (Dkt. 200-1, Ex. A, p. 18). While in segregation waiting for a transfer, Mr. Vinson sent a kite to former defendant Sharon Paratchek saying "I have pains in my scrotums, back, stomach, and anus. I can barely walk." (Dkt. 200-1, Ex. A, p. 17). Nurse Paratchek stated that his complaint required further assessment but noted that he had "an appointment scheduled this week with a MSP, you can discuss these issues at that time." (Dkt. 200-1, Ex. A, p. 17). However, on May 22, 2012,

NP Lybarger noted that Mr. Vinson was a "no show" for his appointment to assess the complaints he raised in his kites. (Dkt. 200-1, Ex. A, p. 16). She indicated that MDOC Nurses should reschedule the appointment. (Dkt. 200-1, Ex. A, p. 16).

On May 23, 2012, Nurse Royer-Thompson cleared Mr. Vinson for transfer from JCF to the Central Michigan Correctional Facility (STF) in St. Louis Michigan despite his missing the MSP appointment on May 22 for a complaint that Nurse Paratchek said needed further follow-up. (Dkt. 200-1, Ex. A, pp. 12-14). On arriving at STF, MDOC Nurse Tiffany Cannefax, R.N. made an urgent MSP referral because Mr. Vinson had lost 40 pounds and had not had a bowel movement in five days, but had bowel sounds present on auscultation. (Dkt. 200-1, Ex. A, p 6). Mr. Vinson was found unresponsive the next morning, before an MSP at STF could assess him. He was pronounced dead at 10:50 a.m. on May 25, 2012. (Dkt. 200-1, Ex. A, pp. 1-5).

## III.   ANALYSIS AND CONCLUSION

### A.   Standard of Review

When a party files a motion for summary judgment, it must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record...; or (B) showing that

the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed.R.Civ.P. 56(c)(1).  The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'"  *Brown v. Scott*, 329 F.Supp.2d 905, 910 (6th Cir. 2004).

In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor.  *Anderson*, 477

U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The Court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine whether a jury could reasonably find that the plaintiff's factual contentions are true by a preponderance of the evidence. *See id.* at 252-53.  Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323.  The Court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the

manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

      B.    <u>Eighth Amendment Deliberate Indifference</u>

      1.    Legal Standards

In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976) (citations omitted). Moreover, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment. *Estelle*, 429 U.S. at 106. A viable Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Farmer*, 511 U.S. at 834. Courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. To establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id.* at 837. In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e., when he or she "consciously disregard[s] a substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839-40). "Basically, there must be a knowing failure or refusal to provide urgently needed medical care which causes

a residual injury that could have been prevented with timely attention." *Lewis v. Corr. Med. Servs.*, 2009 WL 799249, at *2 (E.D. Mich. Mar. 24, 2009).

     2.    Objective Component

    According to the Corizon defendants, plaintiff alleges that Mr. Vinson's serious medical need was an AAA and, at no point during the time frame of their involvement, did Mr. Vinson present with symptoms consistent with an AAA. Thus, defendants did not ignore any diagnosis, and Mr. Vinson did not display any obvious signs or symptoms that a lay person would have understood to require the need for a doctor's immediate attention. *Blackmore v. Kalamazoo Co*., 390 F.3d 890, 897 (6th Cir. 2004). They posit that if Mr. Vinson did have an AAA at that time, it was a non-obvious malady. *Napier v. Madison Co.*, 238 F.3d 739 (6th Cir. 2001). As a result, there must be verifying medical evidence to show that Mr. Vinson suffered harm due to the care he received. *Id*. Plaintiff alleges Mr. Vinson died as a result of the Corizon Defendants not doing more for Mr. Vinson. (Dkt. 63, Pg ID 1067, ¶ 235(A)). However, the Corizon defendants maintain that this alleged failure to diagnose is simply a negligence claim, which is insufficient to sustain a claim of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Hicks v. Frey*, 999 F.2d 1450, 1455 (6th Cir. 1993).

    If Mr. Vinson's serious medical need was specifically and only his AAA, then the Corizon defendants are correct. This condition was both non-obvious and

not previously diagnosed. Further, there is no evidence in the record establishing

that the AAA was present at the time the Corizon defendants were treating him.

Indeed, Corizon's experts opine that Mr. Vinson's complaints of pain accompanied

by nausea and vomiting are not consistent with the pain associated with an AAA.

(Dkt. 183-9, Pg ID 3393, Dr. Gerald Shiener report); (Dkt. 183-8, Report of Dr.

Michael Duffy; "Although he had chronic complaints of abdominal pain and back

pain for almost 2 years, these symptoms are unlikely to have been due to the

presence of an unruptured aortic aneurysm."). Dr. Todd Wilcox further opined that

the AAA was likely to have developed very close in time to Mr. Vinson's death:

> Mr. Vinson died of a ruptured saccular abdominal aortic
> aneurysm. This is a rare condition that is notoriously
> difficult to diagnose in patients. Most patients with an
> abdominal aortic aneurysm have no symptoms and when
> there are symptoms it can often times be very difficult to
> pinpoint the actual cause of those symptoms because they
> tend to be vague, generalized, nonspecific, and frequently
> intermittent symptoms that mimic other disease entities.
> The aneurysm likely had an inflammatory component to
> it based on clinical history and microscopic examination
> at autopsy. It is difficult to pinpoint the point in time
> when the aneurysm developed but it likely was fairly
> near in time to his death.

(Dkt. 183-6, Pg ID 3286). Notably, Dr. Randall Stolz opined that Mr. Vinson's

complaints do not "conclusively" relate to his ruptured AAA. Rather, according to

Dr. Stolz, Mr. Vinson's complaints varied tremendously and did not have the

classic signs of bruits or pulsations. Dr. Stolz also opined that none of Mr.

Vinson's complaints would have suggested to medical personnel that he was

suffering from an AAA.  (Dkt. 183-5, Pg ID 3281-82).  Further,

> Aneurysms of this nature may develop rapidly or
> overtime and are generally asymptomatic and most
> commonly discovered incidentally while a patient is
> receiving an abdominal MRI or CT scan for some other
> reason.  An abdominal aortic aneurysm often exists
> undetected until it ruptures.  In addition, it is extremely
> unusual to see a ruptured abdominal aortic aneurysm in a
> 43 year old patient without significant trauma involved.

*Id*. at Pg ID 3282.  Plaintiff has not placed any verifying medical evidence in the

record suggesting that plaintiff suffered from an AAA while the Corizon

defendants were treating him.

If the Court considers plaintiff's more generalized complaints of pain,

nausea, and vomiting, however, then plaintiff has established a serious medical

need sufficient to satisfy the objective component of the deliberate indifference

test.  Nevertheless, as discussed below, even viewing the evidence in the light most

favorable to plaintiff, there is no genuine issue of material fact as to the subjective

component of the deliberate indifference test and thus, summary judgment in

defendants' favor is warranted.

### 3.    Subjective Component

The individual Corizon defendants offer two related arguments in support of

their assertion that plaintiff's evidence does not create a genuine issue of material

fact on the subjective component of the deliberate indifference test.  First, they

argue that they cannot be held vicariously liable for the actions (or inactions) of any MDOC employees or other medical personnel who responded to Mr. Vinson's medical complaints.  Second, they argue that they each provided constitutionally adequate care to Mr. Vinson; and, that plaintiff merely disagrees with the course of treatment provided and the medical judgment of the providers, which does not amount to a constitutional violation.

The Corizon defendants maintain that there is no evidence to support plaintiff's allegation that Dr. Miles, Dr. Rhodes, or Dr. Jenkins ignored Mr. Vinson or provided constitutionally inadequate treatment.  Rather, they argue that the evidence shows that Dr. Miles went to great lengths to ensure that Mr. Vinson received appropriate care and that plaintiff merely disagrees with the course of treatment provided by all three physicians.

According to plaintiff, Dr. Miles *should have known* about Mr. Vinson's AAA, but because he did not request any tests for Mr. Vinson's abdominal area, he did not discover this condition.  (Dkt. 207, Ex. 5, pp. 70-71).  Plaintiff also points out that Dr. Miles had the authority to refer patients to the Duane Waters facility for a higher level of care and that, in hindsight, a referral to a gastroenterologist may have yielded something.  (Dkt. 207, Ex. 5, pp. 108, 156-157).  Notably, Dr. Miles sent Mr. Vinson to the ER in December 2011 because he felt Vinson presented with symptoms that could not be addressed at the Cotton facility and

needed further evaluation.  (Dkt. 207, Ex. 5, pp. 161-162).  Dr. Miles recalled that

the ER had issued instructions regarding Mr. Vinson.  (Dkt. 207, Ex. 5, pp. 164,

205-206).  Dr. Miles states that Mr. Vinson had been evaluated numerous times

over a couple of years.  (Dkt. 207, Ex. 5, pp. 193-194).  Plaintiff seems to be

suggesting that Dr. Miles was deliberately indifferent because he did not

specifically order an MRI or ultrasound, and did not send Mr. Vinson back to

Duane Waters even though his symptoms had worsened, and despite multiple

evaluations with no resolution of his symptoms.  Plaintiff makes the same general

argument as to Dr. Rhodes.  (Dkt. 207, Pg ID 4013-14).  As to all three individual

defendants, plaintiff generally argues that (1) the medical records contain

numerous contacts with Mr. Vinson, (2) the three doctors were aware of his

symptoms, and (3) his symptoms were worsening over a six month period.  They

also knew he had been taken for emergency treatment and were instructed to return

him to the emergency room if his symptoms worsened.  His symptoms continued

to persist after his trip to the ER for five additional months and, according to

plaintiff, all three physicians refused to provide Mr. Vinson with adequate medical

care.  He says Mr. Vinson died as a result of the defendants' failure and refusal to

provide proper medical care. Moreover, he says they should have known their

failure to act would result in a violation of his constitutional rights.

Plaintiff cites *Weeks v. Chabowdy*, 984 F.2d 185, 187 (6th Cir. 1993) for the proposition that the Corizon defendants in this case "*should have known*" that "their inaction . . . resulted in . . . death." (Dkt. 207, Pg ID 4017) (emphasis in original). The Corizon defendants point to *Farmer v. Brennan*, 511 U.S. 825 (1994), which they say rejects any "should have known" standard. As Justice Souter said, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id*. at 838. According to the Corizon defendants, deliberate indifference cannot be premised upon the argument that they "should have known" of a serious medical need they did not identify. Rather, under § 1983, actual knowledge of a serious medical need is required to support a claim of deliberate indifference. *Rouster v. County of Saginaw*, 749 F.3d 437, 451-452 (6th Cir. 2014) (defendant's mistaken belief that symptoms were from alcohol withdrawal not deliberately indifferent where plaintiff alleged failure to treat); *Burgess v. Fischer*, 735 F.3d 462, 477 (6th Cir. 2013) (failure to investigate plaintiff's condition further was at most negligent, not deliberately indifferent). The Corizon defendants maintain that there is no evidence that any of them knew or must have known that Mr. Vinson had an AAA, and plaintiff's arguments that they "should have" known is without merit or legal support.

35

The undersigned agrees that plaintiff's assertion that they "should have known" lacks merit because this is not the appropriate legal standard to be applied. Rather, in cases where an inmate alleges deliberate indifference but the record demonstrates that the inmate received medical attention and is, in essence, filing suit because he disagrees with certain treatment decisions made by the medical staff, the plaintiff's Eighth Amendment claim must fail. *See McFarland v. Austin*, 196 Fed. Appx. 410, 411 (6th Cir. 2006) ("as the record reveals that McFarland has received some medical attention and McFarland's claims involve a mere difference of opinion between him and medical personnel regarding his treatment, McFarland does not state a claim under the Eighth Amendment"); *White v. Corr. Med. Servs., Inc.*, 94 Fed. Appx. 262, 264 (6th Cir. 2004) (affirming dismissal of the complaint for failure to state a claim where the essence of plaintiff's claims was that he disagreed with the defendants' approaches to his medical treatment where defendant discontinued plaintiff's previous course of treatment and prescribed what plaintiff considered to be less effective treatment). The Sixth Circuit has ruled, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703.

Nonetheless, "[p]rison officials may not entirely insulate themselves from liability . . . simply by providing some measure of treatment.  Indeed, deliberate indifference may be established . . . where it can be shown that a defendant rendered grossly inadequate care or made a decision to take an easier but less efficacious course of treatment."  *Jones v. Muskegon Co*., 625 F.3d 935, 944-45 (6th Cir. 2010).  Further, a claim of inadequate medical treatment may state a constitutional claim if the treatment rendered is "so woefully inadequate as to amount to no treatment at all."  *Westlake v. Lucas*, 537 F.2d 857, 860-861 (6th Cir. 1976).  "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established."  *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992).

The undersigned has taken the above standards into account, and in this case, viewing the evidence in the light most favorable to the plaintiff, the evidence does not show that the treatment provided by these three defendants was "woefully inadequate."  Rather, the evidence shows that the Corizon defendants provided fairly extensive treatment and tried to resolve Mr. Vinson's symptoms.  While the Corizon defendants were unable to resolve plaintiff's symptoms, the record shows there were many attempts to figure out what was causing plaintiff's symptoms and attempts to provide relief.  (Dkt. 200-1, Ex. A, pp. 33-35, 39-45, 51-54, 56-57, 61-64, 71-75, 87-88, 97-100, 101-102, 109-115, 120-124, 128-131, 140-142, 145-148,

153-155, 169-172, 175-175; Dkt. 98-4, Ex. D, pp. 50-51).  *Rouster v. Cnty. of
Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014) ("[A] plaintiff alleging deliberate
indifference must show more than negligence or the misdiagnosis of an ailment.");
*Gabehart v. Chapleau*, 110 F.3d 63, 1997 WL 160322, at *2 (6th Cir. Apr. 4,
1997) ("Misdiagnoses, negligence, and malpractice are not, however, tantamount
to deliberate indifference.").  Though those attempts did not include the diagnostic
tests plaintiff now says should have been performed, the mere failure to perform
diagnostic tests which, in the medical judgment of the Corizon defendants were not
warranted by Mr. Vinson's presentation, is not such woefully inadequate treatment
as to constitute deliberate indifference.  *See Wright v. Genovese*, 694 F.Supp.2d
137, 155 (N.D.N.Y. 2010) ("[d]isagreements over medications, diagnostic
techniques, forms of treatment, the need for specialists, and the timing of their
intervention implicate medical judgments and not the Eighth Amendment.").  This
conclusion is also well-supported by the expert opinions offered by defendants and
discussed in more detail above.

Significantly, plaintiff points to no evidence that any of the Corizon
defendants ignored any perceived medical need or substantial risk of harm to Mr.
Vinson.  Rather, the evidence shows that all of the Corizon defendants evaluated
and treated Mr. Vinson's complaints based on their professional medical
judgments.  Much of plaintiff's argument focuses on Mr. Vinson's alleged weight

loss of 40 pounds between October 2011 and May 24, 2012.  (Dkt. 207, p. 2).  On

October 20, 2011, Mr. Vinson weighed 185 pounds.  (Dkt. 200-1, Ex. A, p. 168).

Mr. Vinson did lose weight over the period that the Corizon defendants treated

him, but the weight loss in that period is not as dramatic as plaintiff suggests.  In

April 2012, Mr. Vinson's weight ranged from 166-172 pounds.  (Dkt. 200-1, Ex.

A, pp. 24, 39, 40, 42).  It was not until May 11, 2012 that Mr. Vinson appeared to

be more rapidly losing weight.  On that date, he weighed 152 pounds.  (Dkt. 200-1,

Ex. A, p. 21).  However, it is undisputed that none of the three defendants were

treating him at this point.  Dr. Rhodes last saw Mr. Vinson approximately four

months before he died, Dr. Jenkins last saw him about six months before he died

and Dr. Miles last treated him on April 25, 2012, although he saw him in his cell

and sent him to the medical clinic to be seen by another physician on May 1, 2012.

Notably, Dr. Miles' last day working for Corizon was May 3, 2012.  During the

time plaintiff claims that his requests for treatment were ignored (February 2012-

April 2012), his weight remained relatively stable, he was treating with a

psychiatrist and a dietician, regularly assessed by nursing staff, provided pain

medication including Toradol shots, and seen by a nurse practitioner.  Mr.

Vinson's kites and requests for treatment were not ignored, and there is no

entitlement to a particular treating provider or a particular treatment.  Rather, as

long as the treatment actually afforded an inmate squares with constitutional

standards, there is no right to demand second opinions, a certain physician, or a particular treatment. *Estelle*, 429 U.S. at 106-07. Even if defendants' treatment decisions were wrong or negligent, this does not rise to the level of deliberate indifference. Plaintiff's disagreement with the course of treatment provided does not amount to deliberate indifference as it is well-settled that "differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim." *Christian v. Michigan Dep't of Corrs.–Health Servs.*, 2013 WL 607783, at \*5 (E.D. Mich. Jan. 28, 2013) (citation omitted), adopted by 2013 WL 607779 (E.D. Mich. Feb. 19, 2013).

Plaintiff also makes much of defendants' failure to send Mr. Vinson back to the emergency room after what he says was a "worsening" of his symptoms, contrary to the emergency room discharge instructions. Plaintiff points to the discharge instructions contained in the ER notes: "He is to return to DWH ER for changing/worsening symptoms." Yet, rather than a treatment plan for an identified medical issue, the referenced instructions appear to be standard discharge language. Moreover, after his discharge from the emergency room, defendants continued to provide regular treatments and assessments, and attempted to alleviate and address Mr. Vinson's symptoms. Mr. Vinson did not experience a drastic worsening of his symptoms until mid-May 2012, when none of the defendants

were any longer involved in Mr. Vinson's care and treatment.  In this vein, at oral

argument on the motion for summary judgment, counsel for plaintiff attempted to

liken the facts of this case to a category of deliberate indifference cases outlined in

*Jones v. Correctional Medical Services, Inc.*, 845 F.Supp.2d 824 (W.D. Mich.

2012) (Maloney, J.).  In that case, the court described Eighth Amendment medical

care cases falling into two categories:  where providers choose one medically

reasonable form of treatment over another, considering the risk to the patient, they

are not deliberately indifferent; however, where a defendant failed to consider

more effective alternatives or the alleged violations involved violations of protocol

or failures of process (that is, where there was no "medical judgment" involved),

deliberate indifference may be found.  *Id*. at 842-843.

The records discussed above show that this case involves medical judgments

regarding Mr. Vinson's course of care.  The cases falling into the second category

described in *Jones*, involved much different facts.  For example, in *Comstock v.

McRary*, a psychiatrist's decision to take a prisoner known to be suicidal (who

ultimately committed suicide) off close observational status was based on a

"facially inadequate" 30 minute conversation, with no review of medical records,

no review of prison guard records, and a failure to take any additional steps that

would have improved his evaluation of the patient, took the claim from mere

negligence to reckless indifference.  *Id*. at 706-709.  Similarly, in *LeMarbe v.

*Wisnecki*, 266 F.3d 429, 432-33, 439 (6th Cir. 2011), a surgeon found five liters of bile in the plaintiff's abdomen, yet sewed him up after he and another doctor were unable to find the leak.  The court found that the surgeon had acted with "conscious disregard."

On the other hand, the present case is much more like the facts in another case cited in *Jones v. CMS*, *Jones v. Muskegon County*, 625 F.3d 935, 938 (6th Cir. 2010), in which the Sixth Circuit affirmed the district court's dismissal of a claim against a detainee's doctor.  The detainee had been complaining about abdominal pain for months when his nurses asked the doctor to examine him.  Though the patient had lost over 40 pounds, the doctor diagnosed him with constipation and gave him a laxative.  *Id*. at 939.  The detainee was examined repeatedly over the next several days before he was taken to the hospital, where exploratory surgery uncovered a cancerous tumor.  The patient died shortly thereafter.  *Id*.  Although the doctor's initial treatment "seem[ed] inappropriate" to the court, the court also noted that the patient did have several symptoms that were consistent with that diagnosis.  *Id*. at 945.  Mere negligence in diagnosing is not actionable indifference, the court noted, and the doctor did schedule various follow-up exams and transferred the patient to the hospital "when it was apparent that his condition was worsening."  *Id*.  In light of these facts, the court found that the doctor's conduct did not constitute deliberate indifference.  *Id*.  Similarly, here, the

evidence suggests that Mr. Vinson's treatment aligned with his symptoms.  While Mr. Vinson was not transferred to a hospital when his symptoms markedly worsened in May 2012, it is undisputed that the Corizon defendants were no longer caring for him at that time.

Plaintiff does not point to any more effective alternative treatment that Mr. Vinson should have received for his symptoms and conceded at oral argument that plaintiff's claim is not that defendants should have diagnosed Mr. Vinson's AAA. As set forth above in connection with the analysis of the objective prong, defendants' experts have all opined that Mr. Vinson's symptoms were generally not consistent with an AAA and he was unlikely to have suffered from an AAA for very long before his death.  Thus, Mr. Vinson did not have a known condition for which defendants' failed to consider more effective alternatives.  Nor does this case present a "failure of process" where defendants are alleged to have violated some type of standard protocol as was the case in *Jones v. CMS*.[2]  In short, this case involves the medical judgments of the Corizon providers and does not rise above mere negligence.  Notwithstanding the sad and unfortunate outcome for

---

[2] Counsel for plaintiff attempted to argue at the hearing that Dr. Miles failed to review certain test results, making this case similar to *Jones v. CMS*, but that is not borne out in the record.  Moreover, as defendants counsel points out, those tests (including some blood tests and stool testing) do not appear to have any connection to the reason that Mr. Vinson died.

plaintiff's decedent, plaintiff has failed to establish a genuine issue of material fact as to the claims of deliberate indifference.

   C.   *Monell* Claims

   In the Amended Complaint, plaintiff alleges that Corizon customs and policies resulted in Mr. Vinson's death.  Specifically, plaintiff alleges that Corizon created a kite system that required inmates with a serious medical condition like Mr. Vinson to first submit a written request for medical treatment, which was then routinely delayed or denied.  (Dkt. 63, Count VIII, ¶¶ 302-315).  Plaintiff further alleges that Corizon created a system of appeals and scheduled visits that was a pretext for denial and delay of providing adequate medical care to inmates for their serious medical condition.  Plaintiff says that Corizon created a system that required inmates with a serious medical condition like Mr. Vinson's to be first seen by a nurse practitioner who lacked adequate medical training to assess serious medical problems and who were vested with the power to deny further specialized treatment based on a cursory physical examination.  According to the Amended Complaint, this policy and custom resulted in the continual denial of adequate medical care for Mr. Vinson's serious medical condition because the nurses would routinely take his written requests for medical treatment, perform a cursory physical examination or none at all in many instances, and send him back to his living area without the necessary treatment.  *Id*.

In their motion for summary judgment, the Corizon defendants argue that there is no evidence of any failure to train, no evidence of any custom of tolerating constitutional violations, and no evidence of any policymaker violating Mr. Vinson's constitutional rights.  In his response, plaintiff articulates a new *Monell* theory, that Corizon willfully and deliberately understaffed physicians.  Plaintiff points to Dr. Miles' testimony that he was required to perform the work of three to four physicians single-handedly and that his complaints were brushed aside by his superiors.  (Dkt. 207, Ex. 5, pp. 246-249).  Plaintiff contends that it is entirely plausible that Corizon's understaffing contributed to a substandard level of care, which contributed to the death of Mr. Vinson.  Plaintiff points to the medical records indicating that Mr. Vinson saw Dr. Miles on February 8, 2012 and did not see a physician again until 10 weeks later on April 25, 2012.  (Dkt. 207, Ex. 2, pp. 140-166).  Mr. Vinson had a single short and abortive visit with a Dr. Sudhir on May 1, 2012 during which no treatment was offered.  (Dkt. 207, Ex. 2, pp. 167-187).  Plaintiff maintains that this was a direct result of Corizon's policy of understaffing its physicians.  Plaintiff also points out that on May 24, 2012, just hours before his death, a nurse at another correctional facility examined Mr. Vinson and determined that he had lost almost 40 pounds and needed urgent emergency medical care.  Mr. Vinson died that evening.  Thus, plaintiff says that Corizon's inadequate staffing directly contributed to his death.

45

In reply, Corizon maintains that plaintiff mischaracterizes Dr. Miles'

testimony in an effort to support this theory.  Dr. Miles testified that "staffing had

constantly changed and the MDOC was shipping a large number of seriously ill

patients to Cotton."  (Dkt. 198-2, Ex. B, Pg ID 4137).  According to Corizon,

neither of the issues Dr. Miles claimed in that statement demonstrates that Corizon

had a policy of understaffing physicians as plaintiff alleges.  Rather, Corizon

argues that his testimony merely demonstrates that: 1) in Dr. Miles' opinion, there

was a frustrating turnover rate of Corizon's providers leaving their positions at

Cotton; and 2) the MDOC (not Corizon) was transferring many sick inmates to the

Cotton facility, which placed a greater demand on providers' time.

Corizon also provides evidence that its staffing was more than adequate via

the affidavit of the Corizon Regional Medical Director over Cotton, Steven

Bergman, D.O.  Dr. Bergman attests that Cotton indeed was and is a "high acuity"

facility; and for that reason, in 2011-2012, Corizon staffed five or six providers at

that facility (rather than two or three providers as it did at other, lower acuity

facilities), would temporarily assign Corizon providers from other facilities to help

at Cotton if they did not have enough providers at certain times, and scheduled

providers to work on weekend days several times per month to provide additional

coverage.  (Dkt. 207, Ex. B).  The National Commission on Correctional Health

Care's (NCCHC) "Staffing" guideline that was in effect at the time provided that a

minimum of 3.5 medical provider hours per week per 100 inmates.  (Dkt. 208, Ex. C).  Corizon also presents evidence to show that it exceeded that minimum in compliance with the NCCHC guideline.  (Dkt. 208, Ex. B).

In addition to its policy of understaffing physicians, plaintiff maintains that Corizon's policy of requiring a kite was intended to delay and withhold treatment to the detriment of Mr. Vinson.  According to plaintiff, between February 9, 2012 and April 25, 2012, the nurses who saw Mr. Vinson at least 15 times, repeatedly kept putting him off with a promise or demand that he complete a kite requesting medical help.  (Dkt. 207, Ex. 2, pp. 140-166).  During that time period, Mr. Vinson saw a physician once; on April 25, 2012.  According to plaintiff, the effect of the policy was to unreasonably delay delivery of proper and adequate medical services.  Plaintiff asserts that the medical records indicate that during the period in question, the nurses did nothing but take a complaint, create a record and send Mr. Vinson back to his cell or in some more egregious instances, refuse to go to the cell to treat him.  (Dkt. 207, Ex. 2, pp. 140-166).  At minimum, plaintiff says that there is a material issue as to whether the kite policy contributed to the delay of proper medical services that led to the untimely death of Mr. Vinson.

In reply, Corizon points out that the kite system is actually the policy of the MDOC, and asserts that it provides an appropriate triage procedure to timely address the whole range of prisoner complaints.  (Dkt. 208, Exhibit D, MDOC

Policy Directive 03.04.100, p. 7 at ¶¶ LL-NN).  Corizon also points out that

prisoners are not required to use the kite system for emergent or urgent medical

needs; rather, they may notify corrections staff, who then are to contact health care

personnel or call an ambulance, as appropriate.  (Dkt. 208, Ex. D, MDOC Policy

Directive 03.04.100, pp. 7-8 at ¶¶ OO-TT).  Moreover, plaintiff argues that the

MDOC nurses (not Corizon) "kept putting [Mr. Vinson] off with a promise or

demand that he complete a kite."  According to Corizon, this simply does not

support plaintiff's policy claim against Corizon.

It is well-established that "[a] defendant cannot be held liable under section

1983 on a respondeat superior or vicarious liability basis."  *Street v. Corr. Corp. of

Am.*, 102 F.3d 810, 818 (6th Cir. 1996) (citing *Monnell v. New York City Dep't of

Soc. Servs.*, 436 U.S. 658 (1978)).  A plaintiff who sues a private or public

corporation for constitutional violations under 42 U.S.C. § 1983 must establish that

a policy or custom caused the alleged injury.  *Sova v. City of Mt. Pleasant*, 142

F.3d 898, 904 (6th Cir. 1998); *Street*, 102 F.3d at 818.  The Sixth Circuit has held

that like a municipal corporation, "[CMS's] liability must also be premised on

some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights."

*Starcher v. Corr. Med. Sys., Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001).  Liability

may be premised on the existence of an express policy adopted by the appropriate

authorities, or on the existence of a custom.  *See Hamer v. Cnty. of Kent*, 2013 WL

8479414, at *2 (W.D. Mich. Nov. 6, 2013), *adopted by* 2014 WL 1276563 (W.D.

Mich. Mar. 27, 2014).  Or, liability may be premised on a failure to institute a

policy or the failure to train its employees.  *Id.*  However, liability exists under this

theory only where the need to act is so obvious, and the inadequacy is so likely to

result in the violation of constitutional rights, that the policy makers can reasonably

be said to have been deliberately indifferent to the need.  *Id.* (citing *City of Canton,

Ohio v. Harris*, 489 U.S. 378, 390 (1989)).  To state a claim under a theory of

"inaction," plaintiff must establish (1) the existence of a clear and persistent pattern

of constitutional violation by employees, (2) notice or constructive notice on the

part of the employer, (3) the employer's tacit approval of the unconstitutional

conduct, and (4) that the failure to act was the "moving force" or direct causal link

in the constitutional deprivation.  *City of Canton*, 489 U.S. at 388-89; *see also

Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

The District Court has held that to maintain a claim against Corizon, a

plaintiff must identify "official policies, the actions of officials with final decision

making authority, a policy of inadequate training or supervision, or a custom of

acquiescence of federal violations."  *Colwell v. Corizon Healthcare, Inc.*, 2014 WL

66867464, at *9 (E.D. Mich. Nov. 26, 2014).  In *Colwell*, the District Court

explained that the illegal policies or customs must lead to violation of a

constitutional or statutory right in the case currently pending before the court.  *Id.*

Moreover, as noted by the Sixth Circuit: before reaching the issue of whether the municipality was deliberately indifferent," the "plaintiff must demonstrate a constitutional violation at the hands of an agent or employee of the municipality." *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007); *see also Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) (finding that municipal liability "must rest on a direct causal connection between the policies or customs of the [local government entity] and the constitutional injury to the plaintiff").

As in *Colwell*, plaintiff has not established that any of Corizon's employees violated Mr. Vinson's constitutional rights. Where plaintiff cannot prove that there was an Eighth Amendment violation by medical treaters, there is no basis of claiming that the treater's employer, here Corizon, had an unconstitutional policy. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983.") (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)); *see also Meier v. Cnty. of Presque Isle*, 2009 WL 1285849, at *3 (E.D. Mich. 2009) (collecting cases holding that there is no municipal liability if the conduct of the individual defendants does not violate plaintiff's constitutional rights), *aff'd*, 376 Fed. Appx. 524 (6th Cir. 2010). Absent a constitutional violation by a subordinate, plaintiff cannot establish that Corizon violated his constitutional rights. As set forth above, the undersigned has

determined that the individual Corizon defendants were not deliberately indifferent to plaintiff's medical needs.  As such, plaintiff's *Monell* claim cannot survive.

The court notes that there may be a narrow exception where a municipality can be liable under § 1983 even when a governmental actor is exonerated because the municipal liability is based on the actions of individuals other than those who are named as parties.  *See Ford v. Grand Traverse Cty.*, 2006 WL 3613292, at *3 (W.D. Mich. Dec. 11, 2006) (citing *Bowman v. Correctional Corp. of Am.*, 350 F.3d 537, 545 (6th Cir. 2003)).  In *Ford*, the District Court noted situations where "the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability."  *Id*. at 3.  In *Ford*, a plaintiff alleged that defendants violated her constitutional rights in that they were deliberately indifferent to her serious medical needs.  The case proceeded to trial, and the jury returned a special verdict, finding the defendant County was deliberately indifferent to the medical needs of plaintiff through its policy or custom regarding weekend medical care and that the policy was a proximate cause of plaintiff's injury.  The jury further concluded that none of the individual corrections officers were deliberately indifferent to plaintiff's serious medical needs.  The defendant County subsequently filed a motion for judgment as a matter of law on the ground that a municipality cannot be held liable under § 1983 unless

a constitutional violation by its agents is first established. The District Court denied the County's motion because defendant failed to advance its arguments regarding municipal liability in the pre-verdict motion. Moreover, defendant submitted the special verdict form used by the jury in resolving liability. The form allowed for a verdict against the County, regardless of the findings made as to the individual defendants. In *Bowman*, while acknowledging that such a situation could exist, the Sixth Circuit determined that the case before it did not present a situation sufficient to establish municipal liability. The *Bowman* court went on to conclude that even if a policy is unconstitutional, there must be a violation of an individual's constitutional rights for municipal liability to be imposed. *Ford*, 2006 WL at *3 (citing *Bowman*, 350 F.3d at 545). Plaintiff does not advance that this exception applies here.

   D.    Civil Conspiracy Under § 1983

A civil conspiracy under § 1983 is "an agreement between two or more persons to injure another by unlawful action." *Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012) (quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985). Absent an unlawful action causing injury, a plaintiff cannot prove the elements required to support a claim for conspiracy. *Farhat v. Jopke*, 370 F.3d 580, 599 (6th Cir. 2004); *Graham v. City of Mentor*, 118 Fed. Appx. 27, 32 (6th Cir. 2004) (affirming dismissal of conspiracy claim where plaintiffs failed to show

viable underlying retaliation claim).  Indeed, "to prevail on a § 1983 civil

conspiracy claim, the plaintiff must show an underlying constitutional violation."

*Umani v. Mich. Dep't of Corr.*, 432 Fed. Appx. 453, 462 (6th Cir. 2011).  The

underlying constitutional violation which plaintiff claims in this case is deliberate

indifference to Mr. Vinson's serious medical needs in violation of the Eighth

Amendment.  Thus, because the undersigned has concluded that the Corizon

defendants are entitled to summary judgment on plaintiff's Eighth Amendment

claims, defendants are also entitled to summary judgment on the civil conspiracy

claim.  *See Bradford v. Owens*, 2016 WL 7015662, at *23 (W.D. Ky. Nov. 29,

2016), appeal dismissed, 2017 WL 6398026 (6th Cir. Feb. 3, 2017) ("[B]ecause

this Court has concluded that Defendants are entitled to summary judgment on

Plaintiff's Eighth Amendment claims, his civil conspiracy claim necessarily

fails.").

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that

defendants' motion for summary judgment be **GRANTED** as to the defendants

Miles, Jenkins, Rhodes, and Corizon.  The undersigned further **RECOMMENDS**

that defendants Taymour and Lyberger be **DISMISSED** pursuant to plaintiff's

agreement, as set forth in the response and joint statement.  (Dkts. 207, 229).

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: August 30, 2018            s/Stephanie Dawkins Davis
                                 Stephanie Dawkins Davis
                                 United States Magistrate Judge

## **CERTIFICATE OF SERVICE**

I certify that on <u>August 30, 2018</u>, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

                                 s/Tammy Hallwood
                                 Case Manager
                                 (810) 341-7887
                                 tammy_hallwood@mied.uscourts.gov